1

2

3

4

5

6

7

8

# UNITED STATES DISTRICT COURT

9

EASTERN DISTRICT OF CALIFORNIA

10

11

LINDA LEE SCHLYTER,

Plaintiff,

12

v.

13

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

14

15

Defendant.

16

_____/

17

Case No. 1:16–cv–1710–SKO

ORDER ON PLAINTIFF'S SOCIAL
SECURITY COMPLAINT

(Doc. 1)

18

## I.   INTRODUCTION

19

On November 9, 2016, Plaintiff Linda Schlyter ("Plaintiff") filed a complaint under 42

20

U.S.C. § 405(g) and 1383(c) seeking judicial review of a final decision of the Commissioner of

21

Social Security (the "Commissioner" or "Defendant") denying her application for Disability

22

Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  (Doc. 1.)  The matter

23

is currently before the Court on the parties' briefs, which were submitted, without oral

24

argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

25

## II.   BACKGROUND

26

On December 1, 2011, Plaintiff filed applications for DIB and SSI, alleging that she

27

became disabled due to depression, anxiety, multiple sclerosis, "four bad back discs," "cognitive

28

---

[1] The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 11, 16.)

functions-don't comprehend things," "sometimes my speech is nonsensical," high blood pressure, and high cholesterol. (Administrative Record ("AR") 30, 218–26, 239.) Plaintiff's date last insured was June 30, 2015, and her alleged disability onset date is February 16, 2010. (AR 30, 218.) Plaintiff was born on November 20, 1964, and was 47 years old on the date her applications were filed. (AR 218, 220.) Plaintiff completed one year of college, and previously worked as an administrator at a document management company from 1988 to 2002, an accounting supervisor at a feed company from 2002 to 2005, a customer service provider at a container company from February to April 2006, and an in-home caregiver from 2006 to 2010. (AR 240.)

## A.    Relevant Medical Evidence[2]

### 1.    Physical Impairments

#### a.    Kaiser Permanente

On September 12, 2008, Plaintiff presented at a Kaiser Permanente facility in Fresno, California to establish care with a primary care doctor. (AR 320.) Plaintiff reported she was diagnosed with multiple sclerosis in 2003, but that her multiple sclerosis was in remission "for the most part" and she was "overall doing fine." (AR 320.) Upon examination, her doctor noted she was alert and oriented, and not distressed, but she exhibited signs of myalgia and joint pain. (AR 320.) Her doctor concluded her multiple sclerosis was stable and she should continue her medication. (AR 320.)

On September 26, 2008, Plaintiff presented at Kaiser Permanente for a follow up appointment. (AR 316.) Plaintiff complained that she was feeling fatigued and "getting stupid" and not able to handle simple tasks she used to do such as checking email and following instructions. (AR 316.) She requested an appointment with a neurologist to evaluate her multiple sclerosis, but her doctor noted her multiple sclerosis continued to be stable. (AR 317.)

On October 1, 2008, Plaintiff presented for a neurology consultation complaining of numbness in her right leg, muscle spasms, and memory problems, but she denied any relapses of

---

[2] As Plaintiff's assertions of error are limited to the ALJ's formulation of his RFC assessment, his consideration of the medical opinions of Paul Griffin, M.D., and Michael Mullan, PhD., and the ALJ's adverse credibility determination against Plaintiff, only evidence relevant to those arguments is set forth in this Order.

her multiple sclerosis.  (AR 313.)   The neurologist noted that Plaintiff was alert and oriented and both her remote and recent memory were intact.  (AR 313.)  The neurologist also noted Plaintiff's muscle tone and strength were normal in her upper extremities and lower left extremity, but Plaintiff exhibited mild weakness in her right leg.  (AR 314.)  The neurologist assessed Plaintiff with multiple sclerosis "characterized by gait ataxia and associated with multiple symptoms of spasticity, urinary incontinence, fatigue and paresthesias, probably relapsing remitting type."  (AR 314.)

### b. Paul Griffin, M.D.

Plaintiff presented to Dr. Griffin for twenty appointments for "pain management" and general care between June 2010 and April 2012.  (AR 354–86.)  The treatment notes from these appointments are handwritten and mostly illegible, but Dr. Griffin refilled Plaintiff's medications at each appointment and noted on June 23, 2010 and June 15, 2011, that Plaintiff's multiple sclerosis was stable on her medications.  (AR 375, 386.)  Additionally, Dr. Griffin diagnosed Plaintiff with chronic back pain and prescribed Norco and Vicodin for the pain.  (AR 382, 386.)  Dr. Griffin continued to treat Plaintiff between May 2012 and November 2013, but these treatment notes are also mostly illegible.  (AR 417–24, 463–70.)

On February 5, 2014, Plaintiff met with Dr. Griffin for a follow up appointment.  (AR 477–80.)  Dr. Griffin noted that Plaintiff "finally" obtained medical insurance and was considering changing neurologists.  (AR 477.)  Upon physical examination, Dr. Griffin observed Plaintiff to be alert and oriented, with normal sensory and motor functions, normal deep tendon reflexes, normal range of motion in her extremities, normal strength, and normal gait.  (AR 478.)  Plaintiff returned for follow up appointments with Dr. Griffin on June 19, 2014, and July 12, 2014, and Dr. Griffin made similar findings following a physical examination.  (AR 452, 461.)

On September 12, 2014, Dr. Griffin completed a physical medical source statement.  (AR 513.)  Dr. Griffin noted Plaintiff's MRI showed plaques characteristic of multiple sclerosis and Plaintiff exhibited the following signs and symptoms: numbness; weakness; stiffness; double vision or other visual disturbances; difficulty with bladder control; speech difficulties; other emotional disturbances; sustained disturbance of gait and station; and significant, reproducible

fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination. (AR 513.) Dr. Griffin opined Plaintiff could stand for fifteen minutes at one time and sixty minutes total in a workday; lift five pounds occasionally, but no amount of weight frequently; and use both arms to work occasionally. (AR 513.)

### c. Community Medical Center

On March 21, 2012, Plaintiff presented at Community Medical Center for an initial consultation. (AR 391–97.) Plaintiff complained of worsening multiple sclerosis symptoms, including trouble focusing, slow comprehension, urinary frequency, left hand clenching, right arm numbness, right face numbness, and slurred speech. (AR 395.) Plaintiff's physical examination revealed normal sensation and proprioception, normal motor strength in upper and lower extremities, normal gait, and no cerebellar signs. (AR 396.) Plaintiff's doctor ordered MRIs of Plaintiff's head and spine. (AR 396.)

On May 9, 2012, Plaintiff presented at Community Medical Center for a follow up appointment and to review the results of her MRIs. (AR 398–405.) The MRI of Plaintiff's head, performed on April 25, 2012, revealed no significant interval change compared to the MRI from June 2006 with stable periventricular white matter hyperintensities compatible with a clinical history of multiple sclerosis. (AR 403.) The MRI of Plaintiff's thoracic spine, performed on April 21, 2012, revealed minor degenerative changes in the thoracic spine involving disc spaces with slight heterogeneity of marrow signal and endplate degeneration. (AR 403–04.) The MRI of Plaintiff's lumbar spine, also performed on April 21, 2012, revealed moderate degenerative changes at the L3–L4, L4–L5, and L5–S1 levels as well as marginal osteophyte formation, degenerative disc bulging, and a pattern of type II degenerative changes of the endplates. (AR 404.) The lumbar spine MRI also revealed a broad base protrusion of the right side L3–L4 resulting in a moderate right foraminal stenosis. (AR 404.) Plaintiff's doctor noted that no "lumbar puncture" procedure was performed in the past and Plaintiff previously responded well to Interferon as a treatment for her multiple sclerosis. (AR 404.)

On July 2, 2014, Plaintiff presented to Gregory Gilmore, D.O., at Community Medical Center for a neurology follow up appointment. (AR 454–59.) Dr. Gilmore noted that Plaintiff

4

had a history of multiple sclerosis, but Plaintiff reported no significant changes in her symptoms. (AR 454.) Plaintiff complained of intermittent slurred speech and difficulty with vision, mainly reading numbers, but was able to read words. (AR 454.) Upon examination, Dr. Gilmore noted no myalgia or joint pain and no problems with anxiety. (AR 454.) A neurological examination revealed reduced sensation and strength in Plaintiff's left upper and left lower extremities, but the examination was otherwise normal with Plaintiff exhibiting normal coordination and intact gait. (AR 457–58.) Dr. Gilmore concluded Plaintiff's multiple sclerosis was stable and in "good control" on her medications and recommended she continue her medications. (AR 458.)

### d. Consultative Examiner Roger Wagner, M.D.

On June 27, 2012, Dr. Wagner performed a comprehensive internal medicine evaluation by reviewing Plaintiff's medical records and examining Plaintiff. (AR 426–31.) Plaintiff complained of multiple sclerosis, hypertension, and low back pain. (AR 427.) Plaintiff reported the left side of her face occasionally felt numb and her legs occasionally felt weak, but she acknowledged her multiple sclerosis had been "essentially stable" over the past three years. (AR 427.) Plaintiff also reported she could walk about six blocks and sit for an hour. (AR 427.) Plaintiff stated that her lower back pain did not radiate down her legs, but bending and lifting exacerbated her back pain. (AR 428.)

Plaintiff reported that she lives alone, and cooks, cleans, and cares for her pets independently. (AR 428.) She does her own laundry and shopping, walks for exercise, and performs her own activities of daily living without assistance, but she does not drive. (AR 428.)

Dr. Wagner noted that Plaintiff walked into her appointment with a moderate-sized backpack and carrying a cane without touching it down. (AR 428.) She was able to get up out of a chair and walk to the exam room at a normal pace without assistance and easily get on and off the exam table. (AR 428.) Dr. Wagner also noted Plaintiff was easily able to bend over at the waist to pick up her shoe from a standing position and put it back on, and she had good manual dexterity, which was assessed by watching her sign her name and manipulate a coin on a table. (AR 428–29.)

Upon physical examination, Dr. Wagner found Plaintiff had a normal gait and was able to walk on her heels and toes, and had normal range of motion in her extremities with full strength and sensation in all extremities.  (AR 429–30.)  Dr. Wagner noted that Plaintiff brought a cane with her, but she was able to walk twenty feet across the exam room without a cane.  (AR 429.)

Dr. Wagner opined Plaintiff could lift and carry fifty pounds occasionally and twenty-five pounds frequently, perform postural activities frequently, stand and walk for six hours, and sit for six hours.  (AR 431.)  Dr. Wagner also opined that the cane did not appear to be necessary, but it may be needed for long distances because Plaintiff occasionally feels her legs are weak. (AR 431.)

### e.  State Agency Physicians

On July 20, 2012, R. Fast, M.D., a Disability Determination Services medical consultant, reviewed the medical evidence of record and concluded Plaintiff could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently, stand and/or walk six hours in an eight-hour day with normal breaks, and sit six hours in an eight-hour day with normal breaks.  (AR 87–88.)  Dr. Fast also concluded Plaintiff could frequently perform postural activities and had no manipulative or communicative limitations.  (AR 88.)  Upon reconsideration, on April 15, 2013, another Disability Determination Services medical consultant, A. Garcia, M.D., performed an independent review of Plaintiff's medical records and affirmed Dr. Fast's opinion.  (AR 128.)

### 2.  Mental Impairments

#### a.  Paul Griffin, M.D.

Prior to January 2014, Plaintiff's mental impairments appear to have been generally treated by her primary care physician, Dr. Griffin.  Plaintiff's treatment notes from Dr. Griffin show she was cooperative and alert with appropriate mood and affect, fluent speech, and appropriate eye-contact.  (AR 452, 457, 461, 478.)  Although Dr. Griffin's treatments are mostly illegible, it appears he prescribed Plaintiff Zoloft for her depression on October 14, 2010.  (AR 383.)

#### b.  Consultative Examiner Mary McDonald, Ph.D.

On July 14, 2012, Dr. McDonald performed a comprehensive psychological evaluation by reviewing the medical records and examining Plaintiff. (AR 435–46.) Plaintiff reported that her multiple sclerosis impacted her ability to stand for any significant period of time as well as her cognitive abilities including her memory and ability to learn new information. (AR 436.) Dr. McDonald noted Plaintiff worked "very, very slowly" on untimed psychological examinations, and took a noticeable amount of time to process information and respond. (AR 436.) However, Plaintiff's cognitive abilities were generally within a normal range, except her processing speed was slower and Plaintiff "clearly had problems with recall and short-term memory as well as visual memory." (AR 437–38.)

Following her examination, Dr. McDonald opined Plaintiff's ability to understand, remember, and carry out short and simple instructions; social judgment; and awareness of socially appropriate behavior, were unimpaired. (AR 439.) Dr. McDonald further opined Plaintiff had mild limitations in understanding and remembering detailed instructions, accepting instructions from supervisors, responding appropriately to criticism, functioning independently, and sustaining an ordinary routine without special supervision. (AR 439.) Additionally, Plaintiff had moderate limitations in maintaining attention and concentration for extended periods, performing activities within a schedule, maintaining regular attendance and being punctual within customary tolerances, interacting with coworkers and the general public, withstanding the stress of a routine workday, and dealing with various changes in the work setting. (AR 439.) According to Dr. McDonald, the likelihood of Plaintiff emotionally deteriorating in a work environment was high. (AR 439.)

c.  Michael Mullan, PhD.

On January 15, 2014, Plaintiff presented to Dr. Mullan for an initial psychological intake evaluation. (AR 483–87.) Dr. Mullan noted that Plaintiff "appeared to be in [a] very good mood" and was clear and oriented. (AR 486.) Following his evaluation, Dr. Mullan concluded Plaintiff "appears to be very stable" though "mildly depressed." (AR 486.)

On February 19, 2014, Plaintiff met with Dr. Mullan for a follow up appointment. (AR 489–91.) Plaintiff reported she had "been feeling depressed lately" because she moved in with

her sister after losing the home she previously lived in with her boyfriend. (AR 489.) Although the handwritten portions of Dr. Mullan's treatment notes are mostly illegible, he concluded Plaintiff appeared to be having difficulty adjusting to her new living arrangements and recommended Plaintiff continue her medications and therapy. (AR 489–90.)

On March 6, 2014, Plaintiff reported to Dr. Mullan that she had "been very depressed lately" and complained that her right leg and arm had been going numb and she had been losing her balance. (AR 492.) Plaintiff stated that "she really want[ed] to work" and was "very frustrated" that she was unable to work. (AR 492.) Dr. Mullan noted that Plaintiff presented as clear and oriented and she appeared stable. (AR 492.) On March 26, 2014, Plaintiff reported that her "depression ha[d] been getting bad" and Dr. Mullan noted that Plaintiff "appear[ed] to be going through a Maj. depressive episode." (AR 495.)

On April 11, 2014, Plaintiff presented for a follow up appointment. (AR 497.) Dr. Mullan noted Plaintiff was clear and oriented and concluded Plaintiff appeared stable. (AR 497.) Dr. Mullan also completed a medical source statement concerning Plaintiff's depression. (AR 448–50.) Dr. Mullan opined Plaintiff had extreme limitations in her activities of daily living and marked difficulty in maintaining social functioning, due to her depression. (AR 448.) Dr. Mullan further opined Plaintiff had marked or extreme impairments in all categories of work-related mental functioning. (AR 449–50.)

On May 1, 2014, Plaintiff reported to Dr. Mullan that she was feeling "very tired" and "worn down." (AR 499.) She further reported that she was "very depressed" because she used to "have a very high powered position" and "travel all over the United States." (AR 499.) Dr. Mullan noted that Plaintiff presented as clear, oriented, and mildly depressed due to her multiple sclerosis. (AR 499.) Plaintiff continued to complain that she was tired and depressed at her appointment on May 22, 2014, and Dr. Mullan noted again that Plaintiff was "mildly depressed" due to her physical limitations, but presented as clear and oriented. (AR 501.) On June 18, 2014, Dr. Mullan noted Plaintiff's speech was clear and goal-directed, and she made good eye-contact. (AR 503.) Dr. Mullan also noted that Plaintiff's depression appeared to be stable. (AR 503.)

On July 18, 2014, Plaintiff reported that she continued to feel "very tired" and was having a difficult time living with her sister. (AR 505.) Dr. Mullan noted Plaintiff's speech was clear and goal-directed, and her thought content was within normal limits, but she was "very depressed" because she was no longer able to work due to her multiple sclerosis. (AR 505.) Dr. Mullan continued to note that Plaintiff appeared "very depressed" due to her multiple sclerosis at her appointment on August 6, 2014, but she made good eye-contact and laughed during the interview. (AR 507.) Dr. Mullan also noted Plaintiff was stable at her next appointment on September 4, 2014. (AR 511.)

On October 8, 2014, Dr. Mullan completed a second medical source statement regarding Plaintiff's ability to work. (AR 514–17.) Dr. Mullan opined Plaintiff's psychiatric conditions caused extreme limitations in her activities of daily living and social functioning. (AR 514.) Dr. Mullan also opined that deficiencies in Plaintiff's concentration, persistence or pace would result in frequent failure to complete tasks in a timely manner, and Plaintiff experienced repeated episodes of deterioration or decompensation that would cause her to withdraw or experience exacerbated signs and symptoms. (AR 515.)

### d. State Agency Physicians

On July 27, 2012, E. Aquino-Caro, M.D., a Disability Determination Services psychological consultant, reviewed the medical evidence of record and concluded Plaintiff could understand, remember, and carryout short simple instructions, and maintain attention and concentration for extended periods of time. (AR 88–89.) However, Plaintiff was moderately limited in her ability to understand, remember, and carryout detailed instructions, as well as her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (AR 88–89.) Upon reconsideration, on April 15, 2013, another Disability Determination Services consultant, A. Garcia, M.D., performed an independent review of Plaintiff's medical records and affirmed Dr. Aquino-Caro's opinion. (AR 131.)

## B. Administrative Proceedings

The Commissioner denied Plaintiff's application for DIB and SSI initially on August 1, 2012, and again on reconsideration on April 18, 2013. (AR 155–59, 165–70.) Consequently,

on June 11, 2013, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 171–73.) Plaintiff appeared with counsel at the hearing on September 12, 2014 and testified before an ALJ as to her alleged disabling conditions. (AR 30; *see generally* AR 49–77.) A vocational expert also testified at the hearing. (AR 69–76.)

### 1. Plaintiff's Testimony

Plaintiff testified that she is unable to work because she is "physically and mentally unable" to do so. (AR 55.) She takes Betaseron injections every other day to treat her multiple sclerosis and Norco for pain, which makes her pain tolerable. (AR 55–56.) She also takes Zoloft for her depression, which helps "somewhat," and attends therapy sessions with a psychiatrist that help "somewhat" as well. (AR 55–56, 58.) Although not prescribed by a doctor, Plaintiff uses a cane most of the time. (AR 57–58.)

Plaintiff testified that she experiences pain off and on every day in her lower back that radiates down both legs, but mostly her right leg. (AR 58–59.) Sitting too long, standing too long, and too much physical activity worsen Plaintiff's pain. (AR 59.) She can sit for fifteen minutes before she has to stand up, and stand for fifteen minutes before she has to sit down. (AR 65–66.) She is able to walk for "100 yards, maybe, or 100 feet." (AR 66.) She has problems using her hands because two to three times a week her left hand will freeze and she will drop things that are in her hand, but she can bend over to pick up the item with her other hand. (AR 66.)

According to Plaintiff, her multiple sclerosis is worse sometimes than others, but she feels confused and emotionally drained most of the time. (AR 59–60.) When her multiple sclerosis flares up, she feels extreme numbness, is unable to understand what she is reading, and has a feeling of self-loathing. (AR 60.) Generally, Plaintiff has problems with short-term memory. (AR 60.) She does not remember to take her medicine and leaves notes to herself to help her remember. (AR 60.) She also has trouble concentrating because she loses focus, but if someone gave her a set of simple instructions, she could follow them if she did it right away. (AR 60.) Plaintiff also testified that she has problems making decisions because she gets confused and has problems getting along with people because she gets irritated. (AR 61.)

Plaintiff lives in a house with her brother-in-law's brother, who helps take care of her. (AR 51, 68.)  On a typical day, Plaintiff wakes up, goes to the bathroom, then goes back to her room and watches TV all day.  (AR 62.)  She alternates positions between sitting and reclining while she is watching TV.  (AR 67.)  She has trouble getting to sleep at times, but if she falls asleep, she will sleep for ten hours or more.  (AR 62.)  She also takes naps most days for three to four hours.  (AR 62.)  She does not need any assistance bathing, dressing, caring for herself, or doing laundry.  (AR 62–63.)  However, she testified that she does not drive, prepare meals, shop for groceries, wash dishes, vacuum, mop or sweep the floors, take out the trash, do any yardwork or gardening, or any other cleaning around the house.  (AR 52, 63–64.)  She also testified that she does not take walks, go to movies or restaurants, or spend time with friends. (AR 64.)  On an average day, Plaintiff testified that she sits for three hours out of an eight-hour period, stands for two hours out of an eight-hour period, and walks for thirty minutes out of an eight-hour period.  (AR 66–67.)  According to Plaintiff, she would be reclined on a hospital bed for the remaining portion of an average eight-hour period.  (AR 67.)

## 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing that Plaintiff has past work experience as (1) a home attendant, Dictionary of Operational Titles ("DOT") code 354.377-014, which was medium work, with a specific vocational preparation ("SVP") of 3; (2) an accounting clerks supervisor, DOT code 216.132-010, which was sedentary work (but light work as performed by Plaintiff) with an SVP of 7; (3) an order taker, DOT code 249.362-026, which was sedentary work, with an SVP of 4; and (4) a publications production supervisor, DOT 979.131-010, which was light work (but medium work as performed by Plaintiff), with an SVP of 8.  (AR 72.)

The ALJ then asked the VE three hypothetical questions.  First, the ALJ asked the VE to consider a person of Plaintiff's age, education, and work experience, who can stand or walk six hours out of an eight-hour day, but may require a cane for walking long distances, and sit for six hours out of an eight-hour day.  (AR 72.)  This person would also be limited to lifting and/or carrying fifty pounds occasionally and twenty-five pounds frequently, and no more than

11

frequent balancing, stooping, kneeling, crouching, crawling, and climbing. (AR 72.) The person would be capable of simple, routine tasks with limited public and coworker interaction in a low stress work environment. (AR 72.) The ALJ then asked the VE whether such a person could perform any of Plaintiff's past work. (AR 72.) The VE testified that such a person would not be able to perform any of Plaintiff's past work. (AR 72.) However, this person could perform the following medium, unskilled work: (1) hand packer, DOT code 920.587-018, SVP of 2; (2) store laborer, DOT code 922.687-058, SVP of 2 and (3) cleaner II, DOT code 919.687-014, SVP of 1. (AR 73.)

The ALJ then asked the VE a second hypothetical question considering the same person with the same capabilities as outlined in the first hypothetical, but who is limited to lifting and carrying twenty pounds occasionally and ten pounds frequently. The VE testified that such a person could not perform any of Plaintiff's previous work, but she could perform the following light, unskilled work: (1) cleaner, DOT code 323.687-014, SVP of 2; (2) office helper, DOT code 239.567-010, SVP of 2; and (3) packer, DOT code 920.685-026, SVP of 2. (AR 73.)

The ALJ asked the VE a third hypothetical question considering the same person with the same capabilities as outlined in the first hypothetical, but who is limited to lifting and carrying ten pounds occasionally and less than ten pounds frequently, standing and/or walking two hours out of an eight-hour day and requires a cane for ambulation, sitting six hours in an eight-hour day, and only occasional stooping, kneeling, crouching, crawling, and climbing ramps and stairs. (AR 73–74.) This person would also never climb ladders, ropes, or scaffolds, and avoid exposure to hazards. (AR 74.) The VE testified that such a person could not perform any of Plaintiff's previous work, but she could perform the following sedentary work: (1) "assembly," DOT code 726.684-110, SVP of 2; (2) inspector, DOT code 726.684-050, SVP of 2; and (3) "loader, semi-conductor," DOT code 726.687-030, SVP of 2. (AR 74.)

The ALJ then asked whether there would be any work available for the individual in the last hypothetical if a limitation to occasional handling, fingering, and feeling, were added. (AR 74.) The VE responded that there would be no work for such an individual. (AR 74.) The ALJ also asked whether there would be any work available for the individual in any of the first

three hypothetical questions if the individuals were off task at least 20% of the time.  (AR 74.)

The VE responded that there would be no work for such an individual.  (AR 74.)

//

    Plaintiff's counsel also asked the VE two hypothetical questions.    First, Plaintiff's counsel asked the VE whether his answer would change if the individual in any of the first three hypothetical questions asked by the ALJ could have no interaction with the public and limited interaction with coworkers and supervisors.  (AR 74–75.)  The VE responded that his responses would be the same because the positions were production positions with no public contact and "very limited" interaction with others.  (AR 75.)  Plaintiff's counsel also asked how the VE's responses would differ "if she needed interaction with supervisors to keep her off task throughout the day, or even simple instructions."[3]  (AR 75.)  The VE responded that such a person would not be able to retain any work.  (AR 75.)

**C.    The ALJ's Decision**

    In a decision dated December 24, 2014, the ALJ found that Plaintiff was not disabled. (AR 30–41.)  The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. §§ 416.920 and 404.1520.  (AR 32–41.)  First, the ALJ found that Plaintiff had not engaged in substantial gainful activity from the alleged onset date, February 16, 2010.  (AR 32.)  At Step Two, the ALJ found that Plaintiff had the severe impairments of degenerative disc disease, multiple sclerosis, depressive disorder, anxiety disorder, and cognitive disorder.   (AR 32.) However, at Step Three, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  (AR 33.)  The ALJ determined that Plaintiff had the residual functional capacity ("RFC")[4]

---

[3] The Court recognizes the confusing nature of Plaintiff's counsel's final question as stated in the hearing transcript, but Plaintiff did not raise the issue as an error in her brief and it appears the VE understood the question based on the clear response.

[4] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of eight hours a day, for five days a week, or an equivalent work schedule.  Social Security Ruling 96-8p.  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, *inter alia*,

to lift and carry 50 pounds occasionally and 25 pounds frequently; stand and walk 6 hours, and sit 6 to 8 hours in an 8-hour workday with normal breaks. She may require a cane for long distances. She can frequently balance, stoop, kneel, crouch, crawl, and climb. In addition, she can perform only simple routine tasks with limited public and co-worker interaction, in a low stress work environment (20 CFR 404.1567(c) and 416.967(c)).

(AR 34.) Of particular relevance to the claims asserted by Plaintiff in the instant action, the ALJ gave limited weight to the opinion of treating physician Dr. Griffin because it was inconsistent with Dr. Griffin's own treatment notes, which showed normal motor function with normal ranges of motion and full motor strength in all extremities. (AR 36.) The ALJ also gave limited weight to the opinion of treating psychiatrist Dr. Mullan because it was inconsistent with his own treatment notes, which show Plaintiff was stable and only mildly depressed, and there was not a long history of treatment with Dr. Mullan. (AR 37.) The ALJ also found Plaintiff's testimony "not entirely credible" because her testimony was undermined by objective medical evidence in the record and Plaintiff's record of conservative treatment, such as medications, which effectively controlled her symptoms. (AR 39.) With respect to Plaintiff's mental limitations, the ALJ found Plaintiff's testimony less credible because her testimony was inconsistent with her activities of daily living. (AR 39.)

The ALJ determined that, given her RFC, Plaintiff was unable to perform any past relevant work (Step Four), but that Plaintiff was not disabled because she could perform a significant number of other jobs in the local and national economies, specifically hand packer, store laborer, and cleaner II (Step Five). (AR 39–40.)

Plaintiff sought review of this decision before the Appeals Council, which denied review on September 9, 2016. (AR 1–6.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481. Plaintiff filed a complaint before this Court on November 9, 2016, seeking review of the ALJ's decision. (Doc. 1.)

### III. SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not

---

medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## IV.  APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003). The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)–(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential

analysis in the process of evaluating a disability. In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting him from performing basic work activities. *Id*. §§ 404.1520(c), 416.920(c). If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1. *Id*. §§ 404.1520(d), 416.920(d). If not, before considering the Fourth Step, the ALJ must determine the claimant's residual functional capacity, which is the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from the claimant's impairments. *Id*. §§ 404.1520(e), 416.920(e). Next, at Step Four, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform his past work. *Id*. §§ 404.1520(f), 416.920(f). If not, in Step Five, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy. *Id*. §§ 404.1520(g), 416.920(g). If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098–99 (9th Cir. 1999); 20 C.F.R. § 404.1520.

## V. DISCUSSION

In her Opening Brief, Plaintiff contends the ALJ erred in four respects: (1) the ALJ's RFC assessment was impermissibly vague; (2) the ALJ failed to articulate sufficient reasons for discrediting Dr. Griffin's opinion; (3) the ALJ erroneously discounted Dr. Mullan's opinion; and (4) the ALJ failed to articulate clear and convincing reasons for discrediting Plaintiff's subjective complaints. (*See generally* Doc. 25 at 9–18.) Defendant responds that the ALJ formulated a sufficiently clear RFC assessment, properly weighed the conflicting evidence and medical opinions regarding Plaintiff's physical and mental limitations, and provided sufficient reasons for discrediting Plaintiff's subjective complaints. (Doc. 26 at 6–15.)

## A. The ALJ's RFC Assessment

1        **1.      Legal Standard**

2        An RFC assessment is an "administrative finding" that is reserved to the Commissioner.

3   *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  The RFC is "the most [a claimant] can still do

4   despite [his or her] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a); *see also* 20 C.F.R. Part

5   404, Subpart P, Appendix 2, § 200.00(c) (defining an RFC as the "maximum degree to which

6   the individual retains the capacity for sustained performance of the physical-mental requirements

7   of jobs").  In formulating an RFC, the ALJ weighs medical and other source opinions, as well as

8   the claimant's credibility. *See, e.g.*, *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226

9   (9th Cir. 2009).  Further, the ALJ must consider "all of [a claimant's] medically determinable

10  impairments"—whether severe or not—when assessing an RFC, and the RFC assessment must

11  be supported by substantial evidence. 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2); *Bayliss v.*

12  *Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005).

13       **2.      The ALJ's RFC Assessment Adequately States Plaintiff's Limitations.**

14       Plaintiff contends the ALJ's RFC assessment and corresponding questions to the VE are

15  erroneous because they contain vague, undefined terms.   Specifically, Plaintiff asserts the

16  statements that Plaintiff "may require a cane for long distances," needs to work in a "low stress

17  work environment," and can only have "limited public and co-worker interaction," are all

18  impermissibly vague and do not adequately state Plaintiff's maximum capacity to work.  (Doc.

19  27 at 2.)  However, Plaintiff does not cite any authority in support of her position other than the

20  general rules that an RFC assessment must set forth a claimant's maximum capabilities and the

21  ALJ's questions to the VE must be "accurate, detailed, and supported by the medical records."

22  (Doc. 25 at 10 (citing 20 CFR §§ 404.1545(a), 416.945(a)), Doc. 27 at 2–3 (citing *Osenbrock v.*

23  *Apfel*, 240 F.3d 1157, 1165 (9th Cir. 2001).)

24       Plaintiff asserts the limitation that Plaintiff "may require a cane for long distances" is not

25  supported by the medical record and impermissibly vague because the word "may" makes it

26  unclear whether Plaintiff actually requires a cane and the term "long distances" is undefined.

27  (Doc. 25 at 10.)  As Defendant points out though, the ALJ's RFC assessment reflects the exact

28  language used in Dr. Wagner's opinion, to which the ALJ gave "significant weight."  (Doc. 26 at

8 (quoting AR 431 ("The examiner concluded that a cane 'may be necessary for long distances, as she occasionally feels that her legs are weak.'")).) The ALJ's limitation is consistent with Plaintiff's maximum capabilities because the record demonstrates that Plaintiff does not require a cane all the time, but may require it sometimes when her legs feel weak. (AR 57 (testifying she has used the cane "off and on" for four years), 427 (stating that Plaintiff uses a cane because she feels her legs are "occasionally weak").) Further, Plaintiff offers no evidence in the record that contradicts the ALJ's assessment or suggests that Plaintiff requires a cane to ambulate. Accordingly, there is substantial evidence in the record supporting the ALJ's RFC assessment and the ALJ's corresponding questions to the VE were "accurate, detailed, and supported by the medical records." *Bayliss*, 427 F.3d at 1217; *Osenbrock*, 240 F.3d at 1165.

Additionally, the ALJ did not err by using the term "long distances" in his RFC assessment and questions to the VE. An ALJ's question to the VE "is acceptable so long as it properly identifies the claimant's impairments and provides sufficient detail to permit a vocational expert to understand the claimant's limitations." *Vasquez v. Astrue*, No. 1:09–cv–01894–SMS, 2011 WL 1363777, at *7 (E.D. Cal. Apr. 11, 2011) (citing *Temple v. Callahan*, 114 F.3d 1195 (9th Cir. May 29, 1997)). Generally, when the ALJ uses an ambiguous or vague term in a question and the VE does not understand a claimant's limitations, the VE clarifies the claimant's limitations with the ALJ. *See Hurst v. Astrue*, No. 1:07–cv–0188–LJO–DLB, 2008 WL 2384043, at *11 (E.D. Cal. June 9, 2008) (rejecting the plaintiff's argument that the term "fair" in the ALJ's question to the VE was ambiguous and noting "there is no indication that the VE did not understand the question or grasp the straightforward definition of 'fair'"); *Smith v. Astrue*, No. CV–08–366–JPH, 2009 WL 3062385, at *6 (E.D. Wash. Sept. 23, 2009) ("The court agrees with: (1) defendant's inference that the terms are sufficiently clear, because the VE did not seek clarification, as they commonly do when a hypothetical is unclear; (2) the ordinary meaning of the terms is sufficiently clear; (3) the terms are commonly used in hypothetical questions to the VE."); *see also, e.g.*, *Bede-Morrell v. Colvin*, No. C2:13–cv–01317–JCC, 2014 WL 2807661, at *4 (W.D. Wash. May 16, 2014) ("Presumably, had the VE been unclear as to any other aspect of the RFC he would have again asked for clarification.").

Here, the VE testified that he was familiar with Plaintiff's work history and testimony, which included her statements regarding her use of a cane, and the VE did not ask any questions seeking to clarify the ALJ's use of the term "long distances." (AR 70, 72–73.) Further, Plaintiff's attorney incorporated the same limitations stated by the ALJ into his questions to the VE. (AR 74–75.) Accordingly, there is no indication the VE did not understand Plaintiff's physical limitations when he testified regarding Plaintiff's capacity to work, and the ALJ did not err by using the term "long distances" in the RFC assessment and questions to the VE.

Moreover, Plaintiff provides no authority to support her position that the terms "may" and "long distances" are impermissibly vague and there is ample authority in the Ninth Circuit affirming RFC assessments with similar limitations. *See, e.g.*, *Shaibi v. Berryhill*, 883 F.3d 1102, 1103–04 (9th Cir. 2017) (affirming ALJ's decision where claimant needed a cane for "walking **long distances**" and the term "long distances" was not further defined) (emphasis added); *Carter v. Astrue*, No. C10–999–TSZ–JPD, 2010 WL 5463093, at *3 (W.D. Wash. Dec. 7, 2010) (affirming ALJ's decision finding the claimant "does not need an assistive device indoors, but **may need one if he walks long distances** for prolonged periods of time") (emphasis added); *see also Gutierrez v. Colvin*, 208 F. Supp. 3d 1117, 1123 (E.D. Cal. 2016) (remanding on other grounds where the RFC assessment provided "a handheld assistive device **may be used for ambulation**") (emphasis added); *Mooney v. Comm'r of Soc. Sec. Admin.*, No. EDCV 11-1251-JPR, 2012 WL 2150855, at *3 (C.D. Cal. June 12, 2012) (affirming the ALJ's decision where the ALJ found the claimant "**may need to use a cane to walk** but not to stand" and the claimant failed to identify any evidence in the record that he required a cane to ambulate) (emphasis added). Accordingly, because Plaintiff bears the burden of proving the ALJ erred, the Court finds the ALJ properly weighed the medical evidence and found Plaintiff "may require a cane for long distances." *See Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." (alterations in original) (quoting *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009))).

The ALJ also did not err by using the term "low stress work environment" in his RFC

assessment and corresponding questions to the VE. Plaintiff does not argue the limitation to a "low stress work environment" is not supported by substantial evidence or offer any inconsistent evidence. Rather, Plaintiff contends the term is vague and cites several cases from outside the Eastern District of California where the ALJ defines the term "low stress." (Doc. 27 at 4 (citing *Henry v. Colvin*, 2016 WL 285-1302, *1 (C.D. Cal. 2016), *Gill v. Berryhill*, 2017 WL 2443814, *1 (W.D. Wash. 2017), and *Morganthaler v. Colvin*, 2015 WL 1235106, *3 (W.D. Wash. 2015)).) However, Plaintiff fails to cite any authority that requires the ALJ to define "low stress." In fact, the term "low stress work environment" and other similar terms are regularly used by ALJs in the Eastern District of California and elsewhere in the Ninth Circuit without further explanation. *See, e.g.*, *Wynn v. Astrue*, No. 1:07–cv–00688–TAG, 2008 WL 4492080, at *4 (E.D. Cal. Sept. 30, 2008) (upholding ALJ's decision where the claimant was limited to "simple, repetitive and complex, detailed tasks, **in a low stress work environment** with limited contact with the public") (emphasis added); *Cain v. Berryhill*, No. 2:16–cv–02145–CKD, 2018 WL 497167, at *1 (E.D. Cal. Jan. 22, 2018) (finding the ALJ's RFC assessment was supported by substantial evidence where the claimant was "limited to the performance of unskilled simple repetitive tasks performed in a **low stress job environment**") (emphasis added); *Thomas v. Astrue*, No. 1:09–cv–01716–DLB, 2010 WL 3260139, at *6 (E.D. Cal. Aug. 18, 2010) (affirming ALJ's decision where RFC assessment limited the claimant to "**low stress jobs**") (emphasis added); *Alderson v. Colvin*, No. CV 12–10588–JPR, 2014 WL 657827, at *2 (C.D. Cal. Feb. 19, 2014) (affirming ALJ's decision where ALJ found the claimant "**requires a low stress work environment**") (emphasis added). Plaintiff's counsel also adopted the limitation in his questions to the VE and the VE did not question the use of the term "low stress work environment," which indicates there was no confusion regarding Plaintiff's capabilities when the ALJ and Plaintiff's counsel limited Plaintiff to a "low stress work environment." *Vasquez*, 2011 WL 1363777, at *7. Accordingly, the ALJ did not err by limiting Plaintiff to a "low stress work environment" in the RFC assessment.

Similarly, the ALJ did not err by finding Plaintiff "can perform only simple routine tasks with limited public and co-worker interaction." Plaintiff does not argue this limitation is not

supported by substantial evidence, but she contends the RFC is vague because the term "limited" does not specify whether Plaintiff can interact with others less than occasionally, occasionally, frequently, or some other variant of periodicity. (Doc. 25 at 11.) Plaintiff again cites no authority for her position that such an RFC limitation is erroneous. However, like the term "low stress work environment," the term "limited public and co-worker interaction" and other similar terms are frequently used in the Eastern District of California and elsewhere in the Ninth Circuit. *Sanders v. Astrue*, No. CIV S–07–714 JAM KJM, 2008 WL 4104294, at *1 (E.D. Cal. Sept. 2, 2008) (upholding ALJ's decision where the claimant was "limited to simple, repetitive tasks with **limited social interaction**") (emphasis added); *Smith v. Astrue*, No. CIV S–10–2941 GGH, 2011 WL 6749803, at *1 (E.D. Cal. Dec. 22, 2011) (affirming ALJ's decision where the ALJ found the claimant "can have **limited interaction with co-workers and supervisors**") (emphasis added); *Hilligas v. Comm'r of Soc. Sec.*, No. 2:16–cv–01382–CKD, 2017 WL 4154981, at *3 (E.D. Cal. Sept. 19, 2017) (affirming ALJ's decision where the ALJ found the claimant "should **avoid working with the public, but can be around the public**") (emphasis added); *Scott v. Colvin*, No. 13–cv–03521 NJV, 2015 WL 5257707, at *3 (N.D. Cal. Sept. 9, 2015) (affirming ALJ's decision where the RFC assessment limited the claimant to "**limited interaction with the general public**") (emphasis added). Additionally, Plaintiff's counsel used the same language in his question to the VE, which involved a hypothetical person that could have no public contact and "limited" interaction with coworkers and supervisors. (AR 75.) The VE did not question the use of the term "limited" interaction in either the ALJ or Plaintiff's counsel's hypothetical questions, which indicates there was no confusion regarding Plaintiff's capabilities. *Vasquez*, 2011 WL 1363777, at *7. Accordingly, the ALJ did not err by finding Plaintiff required "limited public and co-worker interaction" in the RFC assessment.

In sum, the ALJ's RFC assessment is not "impermissibly vague" as Plaintiff contends. All the terms and phrases in the ALJ's RFC assessment and questions to the VE are regularly used by other ALJs in RFC assessments in the Ninth Circuit and Plaintiff has provided no contrary authority. Moreover, there is no indication the VE did not understand the limitations when he opined as to Plaintiff's job prospects. In sum, the ALJ's RFC assessment is supported

by substantial evidence, and the ALJ did not err by finding Plaintiff "may require a cane for long distances," needs to work in a "low stress work environment," and has a "limited" capacity for public and coworker interaction.

**B.     The ALJ's Consideration of the Medical Opinions**

        **1.     Legal Standard**

The ALJ must consider and evaluate every medical opinion of record. *See* 20 C.F.R. § 404.1527(b) and (c) (applying to claims filed before March 27, 2017); *Mora v. Berryhill*, No. 1:16–cv–01279–SKO, 2018 WL 636923, at *10 (E.D. Cal. Jan. 31, 2018). In doing so, the ALJ "cannot reject [medical] evidence for no reason or the wrong reason." *Mora*, 2018 WL 636923, at *10.

Cases in this circuit distinguish between three types of medical opinions: (1) those given by a physician who treated the claimant (treating physician); (2) those given by a physician who examined but did not treat the claimant (examining physicians); and (3) those given by a physician who neither examined nor treated the claimant (non-examining physicians). *Fatheree v. Colvin*, No. 1:13–cv–01577–SKO, 2015 WL 1201669, at *13 (E.D. Cal. Mar. 16, 2015). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citations omitted); *see also Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) ("By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians." (citing 20 C.F.R. § 404.1527)). The opinions of treating physicians "are given greater weight than the opinions of other physicians" because "treating physicians are employed to cure and thus have a greater opportunity to know and observe the patient as an individual." *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996) (citations omitted).

To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. *Lester v.*

*Chater*, 81 F.3d 821, 830–31 (9th Cir. 1995). In contrast, a contradicted opinion of a treating or examining professional may be rejected for "specific and legitimate reasons that are supported by substantial evidence." *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (citing *Ryan*, 528 F.3d at 1198); *see also Lester*, 81 F.3d at 830–31. "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Trevizo*, 871 F.3d at 675 (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)). While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (supported by different independent clinical findings), the ALJ may resolve the conflict. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing *Magallanes*, 881 F.2d at 751). The regulations require the ALJ to weigh the contradicted treating physician opinion, *Edlund v. Massanari*, 253 F.3d 1152, 1157 (9th Cir. 2001),[5] except that the ALJ need not give it any weight if it is conclusory and supported by minimal clinical findings. *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (treating physician's conclusory, minimally supported opinion rejected); *see also Magallanes*, 881 F.2d at 751. The opinion of a non-examining professional, by itself, is insufficient to reject the opinion of a treating or examining professional. *Lester*, 81 F.3d at 831.

### 2. The ALJ Stated Sufficient Reasons for Rejecting Dr. Griffin's Opinion.

Dr. Griffin was Plaintiff's primary care physician and provided an opinion on September 12, 2014, regarding Plaintiff's capacity to work. (AR 513.) Dr. Griffin opined that Plaintiff could stand for fifteen minutes at one time and sixty minutes total in a workday; lift five pounds occasionally, but no amount of weight frequently; and use both arms to work occasionally. (AR 513.) In discrediting Dr. Griffin's opinion, the ALJ stated:

> I give limited weight to this opinion because the limitations are not supported by or consistent with the record including Dr. Griffin's own examination findings, which showed normal motor function with normal range of motion and full motor strength in all extremities.

[5] The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; and (6) specialization. 20 C.F.R. § 404.1527.

(AR 36.) An ALJ may properly discount a treating physician's opinion that is inconsistent with the physician's treatment notes or the record as a whole. *Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir. 2003) ("We hold that the ALJ properly found that Dr. Magsarili's extensive conclusions regarding Connett's limitations are not supported by his own treatment notes."); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by record as a whole, or by objective medical findings). Although not specifically identified by the ALJ as a basis for its rejection, Dr. Griffin's opinion is contradicted by the medical opinions of consultative examiner Dr. Wagner and Disability Determination Services non-examining consultants Drs. Fast and Garcia. In contrast to Dr. Griffin's opinion, these three doctors all opined Plaintiff could lift and carry fifty pounds occasionally and twenty-five pounds frequently, and stand and walk for six hours in an eight-hour day. (AR 80–81, 91–92, 431.) Since Dr. Griffin was a treating physician, the ALJ was required to state "specific and legitimate" reasons, supported by substantial evidence, for rejecting his opinion. *Trevizo*, 871 F.3d at 675 (citing *Ryan*, 528 F.3d at 1198); *see also Lester*, 81 F.3d at 830.

Here, the ALJ discredited Dr. Griffin's opinion because it was inconsistent with his own treatment notes. In support of this finding, the ALJ cited by exhibit and page number to portions of Dr. Griffin's treatment notes showing Plaintiff was more functional than Dr. Griffin opined. For example, while Dr. Griffin opined Plaintiff could stand for only sixty minutes total in a day and only occasionally use her arms to work, the ALJ noted Dr. Griffin's treatment notes from February, June, and July 2014, all showed Plaintiff exhibited normal motor function with normal ranges of motion and full motor strength in all extremities. (AR 36 (citing AR 452, 461, 478).) The ALJ also cited to Plaintiff's treatment notes from the Community Healthcare Clinic and Plaintiff's examination by Dr. Wagner containing similar findings. (AR 36 (citing AR 396, 428–30).) Such sharp contradictions between Dr. Griffin's treatment notes and the extreme limitations in his opinion constitute "specific and legitimate" reasons for discrediting his opinion. *Ortiz v. Astrue*, No. 1:11–cv–00064 SKO, 2012 WL 639508, at *10 (E.D. Cal. Feb. 24, 2012) (stating that "a contradiction between a treating physician's opinion and her treatment

notes" constitutes a "specific and legitimate reason for rejecting the treating physician's opinion" (citing *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 692–93 (9th Cir. 2009)); *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (finding that inconsistencies between a treating physician's treatment notes and their opinion was an "adequate reason[ ] for not fully crediting" the physician's opinion).

Plaintiff contends the ALJ erred because the ALJ's opinion does not account for the "waxing and waning" of Plaintiff's condition. (Doc. 25 at 15–16.) In support of her position, Plaintiff cites to other portions of Dr. Griffin's treatment notes where Dr. Griffin prescribed Plaintiff medication for pain and found Plaintiff to have reduced muscle strength on one occasion. (Doc. 25 at 15 (citing AR 457, 479).) However, it is "the ALJ's responsibility to make credibility findings and resolve conflicts in the medical evidence." *Weimer v. Callahan*, 124 F.3d 215 (9th Cir. 1997). "If the evidence supports more than one rational interpretation, we must uphold the decision of the ALJ; we are in no position to second-guess the ALJ's choice among conflicting medical opinions." *Id.* Accordingly, the Courts finds the ALJ properly discredited Dr. Griffin's opinion because it was inconsistent with his own treatment notes.

### 3. The ALJ Stated Sufficient Reasons for Rejecting Dr. Mullan's Opinion.

Dr. Mullan treated Plaintiff for her mental impairments and provided two medical source statements regarding Plaintiff's capacity to work. (AR 448–50, 514–17.) In both opinions, Dr. Mullan opined Plaintiff had marked and extreme mental limitations in her ability to work. In discrediting Dr. Mullan's opinion, the ALJ stated:

> I give limited weight to this opinion because the limitations are not supported by or consistent with Dr. Mullan's own treatment notes, which showed her to be stable and mildly depressed (Exhibit 16F, pp. 6, 12, 17, 23). She was alert and oriented to time, person, place and situation. Furthermore, limited weight is also given to Dr. Mullan because there is not a longitudinal history establishing treatment, the records showed treatment began in January 2014 (Exhibit 16F, p. 3).

(AR 37.) In other words, the ALJ discredited Dr. Mullan's opinion because it was inconsistent with his own treatment notes, and there is a limited record of Plaintiff's mental health treatment history with Dr. Mullan.

An ALJ may properly discount a treating physician's opinion that is inconsistent with the physician's treatment notes. *Connett*, 340 F.3d at 875; *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) ("A conflict between treatment notes and a treating provider's opinions may constitute an adequate reason to discredit the opinions of a treating physician or another treating provider.") Although not specifically identified by the ALJ as a basis for its rejection, Dr. Mullan's opinion is contradicted by the medical opinion evidence of consultative examiner Dr. McDonald. While Dr. Mullan opined Plaintiff had marked and extreme difficulty in maintaining social functioning, Dr. McDonald opined Plaintiff's social judgment and awareness of socially appropriate behavior were unimpaired. (AR 439, 514–15.) Thus, the ALJ was required to state "specific and legitimate" reasons, supported by substantial evidence, for rejecting Dr. Mullan's opinion. *Trevizo*, 871 F.3d at 675 (citing *Ryan*, 528 F.3d at 1198); *see also Lester*, 81 F.3d at 830.

Here, the ALJ found Dr. Mullan's opinion less credible because it was inconsistent with his own treatment notes. Despite Dr. Mullan's opinion that Plaintiff had extreme and marked difficulties with activities of daily living and social function, the ALJ noted that Dr. Mullan's treatment notes show Plaintiff was only mildly depressed and stable. (AR 37 (citing AR 486, 492, 497, 503).) These same treatment notes from Dr. Mullan also include notes showing that Plaintiff "appeared to be in [a] very good mood" (AR 486), "presented clear and oriented" (AR 492, 497), and "ma[de] good eye contact[] [t]hrough the[] interview" (AR 503). Such sharp contradictions between Dr. Mullan's treatment notes and the extreme limitations in his opinion constitute "specific and legitimate" reasons for discrediting his opinion. *Ortiz*, 2012 WL 639508, at *10; *Rollins*, 261 F.3d at 856.

Without citing any authority, Plaintiff responds by identifying other portions of Dr. Mullan's treatment notes showing more severe symptoms. (AR 25 at 12–14.) At best, Plaintiff's citations only show there was contradictory evidence in Dr. Mullan's treatment notes regarding Plaintiff's mental impairments. As it is the ALJ's role to resolve such inconsistencies when making credibility determinations, the Court will not second-guess the ALJ's findings. *Davidson v. Sec'y of Health & Human Servs.*, 28 F.3d 105 (9th Cir. 1994) ("We are in no

position to second-guess the ALJ with regard to the credibility of the medical testimony offered." (internal quotations omitted)).

The ALJ also discredited Dr. Mullan's findings because "there is not a longitudinal history establishing treatment." (AR 37.) Plaintiff responds that her failure to obtain mental health treatment until January 2014 is not a valid reason for rejecting Dr. Mullan's opinion because mental health disorders such as depression are undertreated. (Doc. 25 at 14.) The Court agrees that Plaintiff's failure to seek treatment for her depression is not a legitimate reason to reject Dr. Mullan's opinion. *See Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996) ("[T]he fact that [a] claimant may be one of millions of people who did not seek treatment for a mental disorder until late in the day is not a substantial basis on which to conclude that [a physician's] assessment of [a] claimant's condition is inaccurate."); *see also Ferrando v. Comm'r of Soc. Sec. Admin.*, 449 Fed. Appx 610, 611–12 (9th Cir. 2011) ("[F]ailure to seek treatment for his mental illness . . . is not a clear and convincing reason to reject his [treating] psychiatrist's opinion, especially where that failure to seek treatment is explained, at least in part, by [the claimant's] degenerating condition.") (citing *Regennitter v. Comm'r Soc. Sec. Admin.*, 166 F.3d 1294, 1299–1300 (9th Cir. 1999) (noting that the Ninth Circuit has "particularly criticized the use of a lack of treatment to reject mental complaints both because mental illness is notoriously underreported and because 'it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation'" (quoting *Nguyen*, 100 F.3d at 1465)).

Moreover, the ALJ fails to explain why nine months of treatment notes from twelve appointments does not constitute a "longitudinal history establishing treatment" or why nine months is not sufficient time for Dr. Mullan to opine as to Plaintiff's mental limitations. 20 C.F.R. § 404.1527(c)(2) (providing that the ALJ will "always give good reasons" for the weight given to any medical opinion and the ALJ will consider the length of treatment and frequency of examination in weighing a treating physician's opinion); *see also Coe v. Colvin*, No. ED CV 16–00238 AFM, 2016 WL 6768908, at *3 (C.D. Cal. Nov. 15, 2016) (finding the ALJ erred in rejecting treating psychologist's opinion based on limited treatment history when ALJ did "not explain why four visits was a basis to discredit [the treating psychologist's opinion], while only

one visit allowed a portion of [the examining physician's] assessment to be given great weight"). Accordingly, the ALJ erred by discrediting Dr. Mullan based on Plaintiff's limited history of mental health treatment.

While the ALJ erred by discrediting Dr. Mullan based on a lack of "longitudinal history establishing treatment" for Plaintiff's depression, such error is harmless because the inconsistency between Dr. Mullan's opinion and his treatment notes, provides an independent basis for discrediting Dr. Mullan's opinion. *Barber v. Astrue*, No. 1:10–cv–01432–AWI–SKO, 2012 WL 458076, at *13 (E.D. Cal. Feb. 10, 2012) (finding harmless error where the ALJ "stated other valid reasons" for rejecting a treating physician's opinion) (citing *Stout v. Comm'r*, 454 F.3d 1050, 1054 (9th Cir. 2006) and *Burch v. Barnhart*, 400 F.3d 676 (9th Cir. 2005)); *Rodriguez v. Berryhill*, No. 1:15–cv–01780–SKO, 2017 WL 896304 (E.D. Cal. Mar. 7, 2017) ("[B]ecause the ALJ articulated another, permissible reason for rejecting Dr. Raypon's assessment of Plaintiff, namely the lack of support in the medical record, this error is harmless." (citing *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008))). Accordingly, because the ALJ provided sufficient specific and legitimate reasons to reject Dr. Mullan's opinion, neither reversal nor remand is warranted.

**C.     The ALJ's Consideration of Plaintiff's Credibility**

**1.     Legal Standard**

In evaluating the credibility of a claimant's testimony regarding subjective pain, the ALJ must engage in a two-prong analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged. *Id.* The claimant is not required to show that his impairment "could reasonably be expected to cause the severity of the symptom [he] has alleged; [he] need only show that it could reasonably have caused some degree of the symptom." *Id.* (quoting *Lingenfelter*, 504 F.3d at 1035–36). Second, if the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if she gives "specific, clear and convincing

reasons" for the rejection. *Id*.

As to the second prong, "[t]he clear and convincing standard is 'not an easy requirement to meet' and it 'is the most demanding standard required in Social Security cases.'" *Wells v. Comm'r of Soc. Sec.*, No. 1:17–cv–00078–SKO, 2017 WL 3620054, at *6 (E.D. Cal. Aug. 23, 2017) (quoting *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014)). "General findings are insufficient" to satisfy this standard. *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (citation omitted). "[R]ather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Id.*; *see, e.g.*, *Vasquez*, 572 F.3d at 592 ("To support a lack of credibility finding, the ALJ [is] required to 'point to specific facts in the record which demonstrate that [the claimant] is in less pain than [he] claims.'" (quoting *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993))); *cf. Burrell*, 775 F.3d at 1138 (stating that the Ninth Circuit's "decisions make clear that [courts] may not take a general finding . . . and comb the administrative record to find specific" support for the finding).

### 2. The ALJ Properly Discounted Plaintiff's Subjective Complaints.

The ALJ found Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible for several reasons. Specifically, the ALJ found Plaintiff's testimony was undermined by 1) Plaintiff's record of conservative treatment, such as medications, which effectively controlled her symptoms, 2) the objective medical evidence in the record, and 3) inconsistencies between her daily activities and testimony regarding her mental impairments. (AR 39.)

#### a. Conservative Medical Treatment

The ALJ's credibility assessment properly relied on evidence showing improvement in Plaintiff's symptoms with conservative medical treatment, such as medications. An ALJ may properly rely on such effective conservative treatment to discredit a claimant's testimony. *Tommasetti*, 533 F.3d at 1040 (favorable response to conservative treatment undermined claimant's testimony of subjective complaints); *Giordano v. Astrue*, 304 Fed. Appx 507, 509 (9th Cir. 2008) ("It was reasonable for the ALJ to conclude that Giordano's testimony overstated her actual limitations, based on Giordano's . . . effective pain management with relatively

conservative treatment."); *see also Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling."); *Clemmons v. Astrue*, No. 1:09–cv–0469–SKO, 2010 WL 3715136, at *7 (E.D. Cal. Sept. 16, 2010) ("[T]he ALJ's consideration of Plaintiff's improvement when she took her pain medication as noted by Dr. Evans in February 2005 . . . was a clear and convincing reason to discount Plaintiff's testimony.").

Ample evidence in the record demonstrates that medication effectively controls Plaintiff's symptoms and the ALJ identified the evidence with specific citations to exhibits and pages in record. Although Plaintiff testified that she is physically unable to work and experiences pain every day in her lower back (AR 55, 58), the ALJ specifically cited to multiple instances in the record where Plaintiff's doctors noted improved functioning on medications. (AR 39 (citing AR 404, 454).) For instance, on May 9, 2012, Plaintiff reported that she "responded well" to Interferon injections to treat her multiple sclerosis. (AR 404.) Additionally, on July 2, 2014, Plaintiff reported her multiple sclerosis was "controlled" on Betaseron and her extremity weakness improved on steroids. (AR 454.) Thus, despite Plaintiff's allegations of debilitating pain and physical limitations from multiple sclerosis, the ALJ properly discredited Plaintiff's testimony based on evidence showing Plaintiff's conservative treatment improved her symptoms.

Plaintiff responds to the evidence of improvement identified by the ALJ, by contending she should not be faulted for failing to seek more aggressive treatment. (Doc. 25 at 17–18.) However, the ALJ did not fault Plaintiff for not seeking more aggressive treatment. Instead, the ALJ concluded Plaintiff's non-aggressive treatment adequately controlled her symptoms. Plaintiff fails to argue that her treatment was not conservative or point to any evidence in the record showing that her medications did not effectively control her symptoms. Accordingly, the Court finds that ALJ properly relied on Plaintiff's conservative treatment record in discrediting Plaintiff's allegations of disabling symptoms and limitations. *Caldeira v. Comm'r of Soc. Sec.*, No. 1:16–cv–01833–SAB, 2017 WL 5192359, at *8–9 (E.D. Cal. Nov. 9, 2017) (upholding the ALJ's credibility determination where Plaintiff's multiple sclerosis was

controlled on medications including injections).

b. Objective Medical Evidence

The ALJ did not err in finding that the objective medical evidence fails to support Plaintiff's subjective complaints. "Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony." *Carmickle*, 533 F.3d at 1161 (citing *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir.1995)); *see also Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir.1999) ("Citing the conflict between [the plaintiff's] testimony of subjective complaints and the objective medical evidence in the record, and noting the ALJ's personal observations, the ALJ provided specific and substantial reasons that undermined [the plaintiff's] credibility."); *Burt v. Colvin*, 611 Fed. Appx 912, 914 (9th Cir. 2015) ("[T]he ALJ properly discredited Burt's testimony because it was contradicted by the medical record.")

Here, the ALJ cited to multiple inconsistencies between Plaintiff's testimony and medical record. For example, the ALJ noted Plaintiff testified she was unable to stand for significant periods, "but physical examination showed normal gait and station with normal ranges of motion and full motor strength in all extremities." (AR 39 (citing AR 428–30, 452, 457, 461, 478).) The ALJ also noted Plaintiff testified she "had problems with memory, but tests showed cognitive abilities were within average range although processing speed was lower." (AR 39 (citing AR 437).) Plaintiff does not dispute these portions of the record identified by the ALJ or argue that they do not contradict her testimony. Accordingly, the Court finds the ALJ properly discredited Plaintiff's testimony regarding her mental and physical impairments based on contradictions between the medical record and Plaintiff's testimony. *Cooper-Belanger v. Berryhill*, No. 2:17–cv–00769 CKD, 2018 WL 2412281, at *5 (E.D. Cal. May 29, 2018) (finding the ALJ "provided proper reasons for making an adverse credibility finding" where the ALJ "noted plaintiff's many normal mental status examinations and her assessed GAF of 80 in November 2010, suggesting only mild impairment"); *Lane v. Colvin*, No. 2:14–cv–02391–AC, 2016 WL 1073259, at *8 (E.D. Cal. Mar. 18, 2016) (finding "the cited medical evidence adequately supports the ALJ's credibility determination" where the ALJ's decision "point[ed] specifically to reports that cast doubt upon [the claimant's] claims"); *White v. Colvin*, No. 1:15–

cv–01367–JLT, 2017 WL 387244, at *9 (E.D. Cal. Jan. 27, 2017) ("Because the ALJ identified inconsistencies between the medical record and Plaintiff's testimony, the objective medical record supports the adverse credibility determination." (citing *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006)).

Plaintiff contends that "[d]ivergence with the objective medical record is not a stand-alone basis for rejecting limitation testimony." (Doc. 27 at 8.) Plaintiff is correct that her allegations of pain and physical limitations cannot be rejected simply because of the absence of objective medical evidence to support it. 20 C.F.R. §§ 416.929(c)(2), 404.1529(c)(2); *Bunnell v. Sullivan*, 947 F.2d 341, 346-47 (9th Cir. 1991) (en banc) ("[T]he adjudicator may not discredit a claimant's testimony of pain and deny disability benefits solely because the degree of pain alleged by the claimant is not supported by objective medical evidence[.]"). However, "the ALJ may consider and rely upon objective medical evidence and physician opinions that **contradict plaintiff's subjective testimony**." *Branson v. Berryhill*, No. 2:15–cv–2675 AC, 2017 WL 1179160, at *6 (E.D. Cal. Mar. 30, 2017) (emphasis added) (citing *Carmickle*, 533 F.3d at 1161)); *see also Ferris v. Colvin*, No. 2:14–cv–02569–AC, 2016 WL 1117771, at *8 (E.D. Cal. Mar. 22, 2016) (finding the ALJ erred by relying on the claimant's activities of daily living to discredit the claimant's testimony, but the error was harmless because of inconsistencies between the testimony and medical record). The ALJ properly relied on portions of the medical record that contradicted Plaintiff's testimony, and there is no error in it.

c. Activities of Daily Living

The ALJ properly considered Plaintiff's activities of daily living in determining that Plaintiff's testimony regarding her mental impairments was not entirely credible. "While a claimant need not vegetate in a dark room in order to be eligible for benefits, the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting. . . . Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." *Molina*, 674 F.3d at 1112–13 (citations and quotation marks omitted); *see also Valentine*, 574 F.3d at

693 (finding the ALJ provided clear and convincing reasons to reject the claimant's testimony that he was unable to work due to PTSD where the claimant's activities suggested he had greater functional capacity than his testimony indicated, even though he could not return to his past work); *Morgan*, 169 F.3d at 600 (ALJ's determination regarding claimant's ability to "fix meals, do laundry, work in the yard, and occasionally care for his friend's child" was a specific finding sufficient to discredit the claimant's credibility).

The ALJ found Plaintiff's daily activities were not "limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (AR 39.) At the hearing, Plaintiff testified that she is unable to work because of her mental impairments and she feels confused and emotionally drained "most of the time." (AR 55, 59–60.) Plaintiff further testified that she has trouble concentrating and could not describe a television show she was watching if someone asked what the show was about. (AR 60, 62.) Plaintiff also testified that she does not prepare any meals or take walks, and does not do any cleaning around the house. (AR 62–64.) However, the ALJ pointed to numerous instances in the record where Plaintiff had the capacity to do substantially more than her testimony suggested. For example, the ALJ noted Plaintiff could attend to her personal hygiene without any assistance, and prepare meals, clean, shop, walk for exercise, and care for her pets. (AR 39 (citing AR 264–71, 275–82, 428).) Thus, the ALJ properly cited to evidence of Plaintiff's daily activities in the record that contradicted Plaintiff's claims of debilitating impairments. *Moncada v. Chater*, 60 F.3d 521, 524 (9th Cir. 1995) (ALJ properly discredited claimant's testimony where claimant's testimony about daily living activities was much more limited than those reported prior to testimony); *see also Raquenio v. Berryhill*, No. 1:16–cv–01830-BAM, 2018 WL 1556782, at *4 (E.D. Cal. Mar. 30, 2018) (finding the ALJ provided clear and convincing evidence in support of her credibility determination by finding Plaintiff's daily activities such as preparing meals, cleaning the house, caring for the yard, shopping, managing finances, and caring for her elderly mother, undermined her allegations of disabling pain and depression); *Valenzuela v. Comm'r of Soc. Sec.*, No. 1:15–cv–00291-SAB, 2016 WL 3569722, at *10 (E.D. Cal. June 30, 2016) (affirming the ALJ's adverse credibility determination where the claimant alleged he could only pay attention for five

minutes, but he watched television, played video games, drove, went to church, went to the movies, read, and shopped).

Plaintiff responds to the inconsistency between her testimony and the activities of daily living identified by the ALJ, by contending she is not as functional as the activities suggest. Specifically, Plaintiff claims that she writes things down to remember them and sometimes relies on a friend to pick up after her pet. (Doc. 25 at 18.) While the record contains some contrary evidence suggesting that Plaintiff's activities are more limited, "credibility determinations are the province of the ALJ" and it is the function of the ALJ to resolve any ambiguities. *See Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989) (finding no error with the ALJ's credibility determination even though the ALJ "could easily have relied on other nonmedical evidence in the record to reach the opposite conclusion"); *Rollins*, 261 F.3d at 857 (affirming ALJ's credibility determination even where the claimant's testimony was somewhat equivocal about how regularly she was able to keep up with all of the activities and noting that the ALJ's interpretation "may not be the only reasonable one"). Although Plaintiff may disagree with the specific findings, the findings were supported by clear and convincing evidence in the record and the Court will not second-guess them. *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002).

## VI.  CONCLUSION AND ORDER

After consideration of Plaintiff's and Defendant's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence and is therefore AFFIRMED. The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security, and against Plaintiff.

IT IS SO ORDERED.

Dated:   **November 6, 2018**                    /s/ *Sheila K. Oberto*
                                         UNITED STATES MAGISTRATE JUDGE